CAROLINE D. CIRAOLO
Acting Assistant Attorney General

W. CARL HANKLA
Trial Attorney, Tax Division
U.S. Dept. of Justice
PO Box 683
Washington, DC 20044
Telephone: (202) 307-6448
Fax: (202) 307-0054
w.carl.hankla@usdoj.gov
*Attorneys for the United States of America*

DANIEL G. BOGDEN
U.S. Attorney, District of Nevada
*Of Counsel*

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| JAMES C. SEXTON JR. and ESQUIRE GROUP LLC,<br><br>     Plaintiffs,<br><br>          v.<br><br>KAREN L. HAWKINS, Director of Office of Professional Responsibility, Internal Revenue Service, Department of Treasury,<br><br>     Defendant. | Civil No. 2:13-cv-00893-JCM-(VCF) |

## United States' (1) Opposition to Motion for Judgment on the Pleadings and (2) Cross-Motion for Summary Judgment

The United States, on behalf of the defendant, hereby opposes the plaintiffs' Motion for

Judgment on the Pleadings and cross-moves for summary judgment under Rules 12 and 56 of the

Federal Rules of Civil Procedure and Local Rule 56-1.  There is no genuine issue of material

fact, and the United States is entitled to judgment as a matter of law.  Filed herewith in support of this motion are the Declarations of Louise M. Kern and W. Carl Hankla.  Also supporting this motion is the Declaration of Karen L. Hawkins, filed previously at ECF No. 22.  A Statement of Material Facts is filed herewith pursuant to Local Rule 56-1.

## Introduction

The plaintiffs—James C. Sexton Jr. ("Sexton"), a disbarred attorney who was suspended from practice before the Internal Revenue Service ("IRS") in 2008, and his company, Esquire Group LLC ("Esquire"), a Nevada company that describes itself as "an international tax advisory firm"—filed this suit against the Director of the IRS's Office of Professional Responsibility[1] ("OPR").  Sexton and Esquire request the Court (i) to declare that OPR has no regulatory authority over Sexton and Esquire and (ii) to enjoin OPR from investigating whether Sexton has engaged in practice while suspended.  Their motion for judgment contends that they are entitled to the relief they seek as a matter of law, based solely on the pleadings.  The United States, on behalf of the named defendant, disagrees.  As discussed below, it is the government that is entitled to judgment as a matter of law, based on the pleadings and the declarations referenced herein.  The Court should conclude that OPR has jurisdiction over Sexton and Esquire, and that OPR is authorized to pursue its investigation of Sexton.  Accordingly, the Court should (1) deny the plaintiffs' motion for judgment on the pleadings and (2) grant the government's cross-motion

---

[1] The named defendant, Karen L. Hawkins, retired in July 2015.  The current Director of the Office of Professional Responsibility is Stephen Whitlock.

for summary judgment.  This case should be dismissed.  In the alternative, if the Court does not

dismiss the case, it should order the parties to file a joint discovery plan.[2]

### Issues Presented

1.  Whether OPR's regulatory authority under 31 U.S.C. § 330[3] extends to tax
    professionals who are not authorized to practice before the IRS because they are
    suspended from practice due to misconduct yet offer services within the scope of the
    statute and its implementing regulations.

2.  Whether OPR's regulatory authority under 31 U.S.C. § 330 extends to the rendering
    of written tax advice within the meaning of subsection (d) of section 330 regardless of
    whether the advisors represent clients in a typical tax controversy before the IRS.

### Statement of Facts[4]

After obtaining an LL.M. degree in International Taxation from Regent University in

2000, Sexton became licensed to practice law in South Carolina in 2002.  Complaint, ¶ 1, ¶ 8;

see Hankla Declaration, Exhibit A.  As a then-member in good standing of a state bar, he was

authorized to represent clients and practice before the IRS under Treasury Department Circular

No. 230 (*Regulations Governing Practice before the Internal Revenue Service*), 31 C.F.R.

---

[2] The United States continues to believe, as argued in its motion to dismiss, that subject matter jurisdiction over this matter is lacking because sovereign immunity has not been waived.

[3] Congress amended section 330 on December 18, 2015 as part of the "Protecting Americans from Tax Hikes (PATH) Act of 2015" (P.L. 114-XXX (H.R. 2029)).  The amendment (sec. 410 of Title IV (Tax Administration)) added a new subsection (b), providing that: "Any enrolled agents properly licensed to practice as required under rules promulgated under subsection (a) shall be allowed to use the credentials or designation of 'enrolled agent', 'EA,' or 'E.A.'."  This new subsection (b) has no effect on this case.  The references to section 330 herein use the pre-amendment subsection lettering.  For example, what is referred to as subsection (d) herein is labeled subsection (e) in the amended version of section 330.

[4] A Statement of Material Facts is filed herewith pursuant to Local Rule 56-1.

1    Subtitle A, Part 10, which implements the authority Congress gave the Secretary of the Treasury

2    in 31 U.S.C. § 330 to regulate tax professionals.  *See* Complaint, ¶ 8.

3         At all times relevant hereto, Sexton has offered professional tax services as President of

4    Esquire.  Complaint, ¶ 13.  Esquire "offers professional international tax guidance" and related

5    services.  See Hankla Declaration, Exhibit B (copy of printout of Esquire homepage).  Sexton's

6    profile on the Esquire website states that he is "[r]egarded as an expert in the field of

7    international taxation" and that he "focuses primarily on advanced tax planning strategies aimed

8    at reducing his clients' global effective tax rate."  *Id.*, Exhibit C.  Among Sexton's "[a]reas of

9    special competence" are "structure design and implementation" with regard to taxes.  *Id.*

10        In 2005, Sexton pleaded guilty in a Los Angeles federal district court to four counts of

11   mail fraud and one count of conspiracy to commit money laundering.  Complaint, ¶ 9.  The plea

12   came after six weeks of trial.  Hankla Declaration, Exhibit A.  The indictment alleged that

13   Sexton had assisted in the criminal activities of his father, James C. Sexton, who had defrauded

14   clients of more than $8 million and placed their funds in bank accounts he controlled in

15   Liechtenstein, a tax haven country.  Hankla Declaration, Exhibit I.  In particular, Sexton assisted

16   in moving the funds through various other foreign bank accounts under fictitious names and

17   nominees in an effort to conceal and disguise ownership.  *Id.*

18        Because of Sexton's felony conviction, his license to practice law was suspended on

19   March 22, 2005.  South Carolina Supreme Court Opinion No. 26472,

20   http://www.judicial.state.sc.us/opinions/displayOpinion.cfm?caseNo=26472; see Hankla

21   Declaration, Exhibit A.  In 2008, he was disbarred.  *Id.*

22

4

On January 28, 2008, based on the disbarment, OPR suspended Sexton indefinitely from practice before the IRS.  Complaint, ¶ 10.  Sexton did not oppose the suspension, and it remains in effect.  *Id.*

After his suspension, Sexton continued to offer professional tax services and to hold himself out as an attorney.[5]  See Hankla Declaration, Exhibits B-C; Kern Declaration, ¶ 4.

On September 5, 2012, OPR received a referral of suspected practitioner misconduct by Sexton.  See Kern Declaration, ¶ 15.  The referral was based on a complaint from a member of the public, Louise M. Kern, a former client of Sexton and Esquire.  Hawkins Declaration, ¶ 3; Kern Declaration, ¶ 15.

Since 2010, Kern has lived in Vienna, Austria, and operated a business, GloBIS, offering international consulting and research services, including background checks and due diligence, through a United States corporation (until 2014, also through an Austrian business entity or GmbH).  Kern Declaration, ¶ 2.  GloBIS serves clients worldwide.  *Id.*

Kern learned about Sexton in 2012 while attending a seminar at Deloitte's offices in Vienna.  Kern Declaration, ¶ 3.  The topic was tax issues faced by United States citizens living and working in Austria.  Id.  Sexton was recommended by a fellow attendee of the seminar, the head of the Expat Center Vienna.  *Id.*  Sexton was also on a list of recommended attorneys maintained by the U.S. Embassy in Vienna.  *Id.*  She later spoke with Sexton on the phone and met him in person.  *Id.*

---

[5] The United States disputes the plaintiffs' contention that Sexton has not been engaged in practice since his suspension.

5

1    During a later seminar in 2012, which was marketed to United States citizens living and

2    working in Austria, Sexton held himself out to be an attorney specializing in international tax

3    law.  Kern Declaration, ¶ 4.  The name of his company was "Esquire Group," indicating that he

4    was an attorney.  *Id*., Exhibit A, p. 1.  His PowerPoint presentation included a slide stating that

5    he had a Juris Doctor degree and an LL.M. in International Taxation.  *Id*., Exhibit A.  It stated

6    further that he "specializes in tax issues facing US citizens and resident aliens living, investing or

7    doing business aboard [sic] as well as foreigners living, investing or doing business in the US."

8    *Id*. at Exhibit A, p. 2.  He represented that he could prepare tax returns for international clients

9    and provide legal advice about how best to structure cross-border business operations for tax

10   purposes.  *Id*. at ¶ 4.

11   Believing that Sexton was a competent international tax attorney, Kern hired him to

12   prepare her United States individual and corporate tax returns for 2011 and amended returns for

13   2010.  *Id*. at ¶ 5.  Sexton had several conversations with Kern and reviewed various documents

14   she supplied to him or his associate.  *Id*.

15   Numerous e-mail messages were exchanged between Sexton and Kern.  *Id*., Exhibits B-

16   C.  His e-mail template included a notice that that the message was a "CONFIDENTIAL

17   COMMUNICATION" that "may contain information that is privileged, confidential, and exempt

18   from disclosure under applicable law," implying that he was an attorney.  *Id*. at ¶ 6.  Also

19   included was a notice regarding any possible tax advice contained in the message, implying that

20   he was a tax practitioner before the IRS:

21   IRS Circular 230 Disclosure:

22                                                    6

1    　　　　To ensure compliance with requirements imposed by the IRS, we inform you that
2    any U.S. federal tax advice contained in this communication (including any attachments)
     is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding
3    penalties under the Internal Revenue Code or (ii) promoting, marketing, or
     recommending to another party any transaction or matter addressed herein.

4    Kern Declaration, ¶ 7, Exhibit B-C.

5    　　　　Sexton suggested that Kern consider restructuring her business affairs for income tax

6    reporting purposes in the United States and Austria.  Kern Declaration, ¶ 8.  During a telephone

7    call on March 7, 2012, Sexton stated that Kern needed to advise the IRS that she owned a foreign

8    company and that "he would have to petition the IRS to apply this status retroactively" if she so

9    chose.  *Id*.  During the same call, Sexton suggested that if she changed the structure of her United

10   States business from a subchapter C corporation to a subchapter S corporation, she could take her

11   compensation in the form of a distribution of profits and a smaller salary (she had always in the

12   past taken out salary but not profits), which, he said, would allow her to reduce her Social

13   Security and Medicare tax obligations.  *Id*. at ¶ 9.

14   　　　　 After further communications, Sexton claimed that he could not prepare Kern's returns

15   without drafting a written legal memorandum analyzing her options for structuring her business

16   affairs for tax purposes.  *Id*. at ¶ 10, Exhibit B.  The fee for this advice would be $5,000.  *Id*.  He

17   wrote:

18   　　　　[My associate] and I have done quite a bit of research on the tax issues
     surrounding your company.  There are basically two structures you can use; one where
19   you keep the GmbH and one where you don't.  Both of these structures have distinct
     advantages, disadvantages and risks.
20
     　　　　* * *   The most efficient way for us to present this information to you is in
21   written format.  This is because in order for you to be able to understand and digest the
     information you need to understand the "why" which is going to require us to explain the
22

7

law; Austrian and US as well as the interaction of the tax treaty between the two. * * *
The cost of drafting the explanation and answering your questions will be $5,000; this
also includes our research time up to this point.

*Id*. at Exhibit B, pp. 2-3.

Sexton anticipated that Kern would object to the size of this fee.  Kern Declaration, ¶ 11.
So he sought to justify the amount by claiming that his expertise was on a par with that of
practitioners at "very large accounting or law firms," who, he said, would charge her three times
what he was quoting:

I know you probably aren't too happy about the price but you have a very
complex issue.  The reason no one has been able to give you an answer to this yet is
because there are very few small tax companies that would be able to answer a question
like this.  Answering a question like this takes expertise in international taxation and most
people with expertise work for very large accounting or law firms.  Questions like this
ordinarily get posed to those large firms and they would charge triple of what we just
quoted.  Living in two different countries and operating a business cross-border is
complex; and competent advice to ensure compliance costs money.

*Id*. at Exhibit B, p. 3.

Kern was not convinced, although Sexton persisted.  Kern Declaration, ¶ 12.  Instead of
agreeing to pay $5,000 for Sexton's written legal advice, she looked into his background.  *Id*. at ¶
13.  She discovered that he had pleaded guilty in 2005 to being part of a money laundering
operation in Europe.  *Id*.  She discovered that he had been disbarred from the practice of law in
South Carolina and suspended from practice before the IRS.  *Id*.  She discovered from Esquire's
website and other online research that an Esquire affiliate was the registered agent for over 200
Nevada shell corporations and that Esquire was advertising transactional services involving bank
accounts in tax haven countries.  *Id*.

Believing that Sexton had wrongly held himself out as a tax attorney and concerned about his integrity, Kern fired him in an e-mail on September 12, 2012.  Kern Declaration, Exhibit C. She contacted the IRS and filed an administrative complaint.  *Id.* at ¶ 15.  When her complaint was referred to OPR, she provided OPR with copies of her e-mail correspondence with Sexton, his PowerPoint presentation, and other documents.  *Id.*

As set forth in the Hawkins Declaration, ECF No.22, OPR determined from the information Kern provided that Sexton may have been engaged in conduct prohibited by the terms of his indefinite suspension from practice before the IRS.  Specifically, OPR sought to investigate whether Sexton was offering, and by extension providing, written tax advice to U.S. taxpayers within the meaning of 31 U.S.C. § 330(d).  If true, this would be a violation of Circular 230 § 10.82(f) and 31 U.S.C. § 330(d).[6]  *See* Complaint, Exhibit B.

On February 25, 2013, OPR sent Sexton, as President of Esquire, a pre-allegation letter with the reference line: "Re: Suspected Practitioner Misconduct Under Circular 230."  Complaint, Exhibit B.  The pre-allegation letter represented the onset of an OPR investigation.  Pursuant to section 10.20(a)(3) of Circular 230, OPR requested information and documents.  Complaint, Exhibit B.  The requests covered topics such as:

- Sexton's educational background

- Esquire's business plan, structure, and employees/members/independent contractors

---

[6] Cf. §10.79(b), Cir. 230 (providing that upon a final decision of suspension in a disciplinary proceeding (or a practitioner's consent to suspension), "the respondent will not be permitted to practice before the Internal Revenue Service during the period of suspension").

- Fee schedules for Esquire's services

- Promotional materials offered by Sexton or Esquire to prospective clients, including "explanations" of federal tax issues  and "all entities, transactions, plans, or arrangements" recommended for tax planning purposes

- Copies of tax returns and related materials prepared for clients

The letter stated that OPR would make an independent determination after gathering the facts:

> [OPR] will begin an investigation of the allegations contained in the referral and will make an independent determination as to whether the issuance of a formal allegation letter with respect to the matters contained therein, or with respect to any other violations discovered during our investigation, is necessary.

Complaint, Exhibit B.

Sexton objected to the scope of OPR's information request.  Complaint, ¶ 29.  On April 12, 2013, OPR limited the request in an e-mail message to Sexton's counsel.  Complaint, Exhibit C.

Instead of complying with OPR's request as limited, Sexton and Esquire commenced this action.  They allege that OPR lacks the authority under Circular 230 to investigate or sanction either of them.  Complaint, ¶ 30.  In paragraph 32 of the Complaint, the plaintiffs recognize that OPR has "asserted that it is investigating Sexton because it has evidence that he has provided tax advice, allegedly in violation of Circular 230."  But they deny that such evidence is sufficient for OPR to conduct an investigation: "the IRS lacks jurisdiction over persons who provide tax advice to private parties generally" (Complaint, ¶ 33), they state, and "the IRS has jurisdiction only to regulate persons who practice before the Department of Treasury and/or the Internal Revenue Service and only to the extent those persons provide advice in connection with

1   representations made to the IRS" (Complaint, ¶ 34).  They rely on *Loving v. Internal Revenue*

2   *Service*, 742 F.3d 1013 (D.C. Cir. 2013), to define the universe of OPR's oversight, a case

3   holding that the Treasury Department and the IRS lack authority under 31 U.S.C. § 330 to

4   regulate persons who merely prepare tax returns for compensation. The plaintiffs seek a

5   declaratory judgment (Complaint, ¶ 38, ¶ 40) that Sexton is not a tax "practitioner" and that the

6   IRS lacks authority over him and Esquire, and they seek an injunction to prevent the IRS from

7   pursuing its allegedly burdensome information request (which they claim would put them out of

8   business if complied with) or to take any action against them if they fail to comply with that

9   request.  Complaint, ¶ 41-¶ 45.  They claim that they will suffer irreparable harm in the absence

10  of equitable relief and that they have no adequate remedy at law.  Complaint, ¶ 46-¶ 47.

11         In response to the complaint, the United States filed a motion to dismiss for lack of

12  subject matter jurisdiction and failure to state a claim upon which relief may be granted.  ECF

13  No. 23.  The Court denied that motion after oral argument.  ECF No. 42.  In its order, the Court

14  stated that the plaintiffs were "not required to produce any documents or respond to any

15  inquiries" relating to OPR's investigation of the plaintiffs while the litigation continues and

16  preliminarily enjoined the IRS from any action to "suspend or curtail" plaintiffs' access to

17  electronic filing of tax returns for clients.  *Id.*

18         The United States filed an answer denying that the plaintiffs are entitled to relief.  ECF

19  No. 45.  The United States filed interlocutory appeal as of right, which it later voluntarily

20  dismissed.  ECF No. 55.  The parties engaged in extensive settlement negotiations while the

21

22
                                        11

1    appeal was pending and after it was dismissed, but they were unable to reach an agreement.  Nor

2    could they agree as to a proposed discovery plan or scheduling order.

3            The plaintiffs then filed their motion for judgment on the pleadings.  The United States

4    responded by filing this opposition and cross-motion for summary judgment.

5                                        **Discussion**

6    **1.  Whether OPR's regulatory authority under 31 U.S.C. § 330 extends to tax**
        **professionals who are not authorized to practice before the IRS because they are**
7        **suspended from practice due to misconduct yet offer services within the scope of**
        **the statute and its implementing regulations.**

8

9           Sexton's first argument is that OPR has no jurisdiction over him because he is not a

10   "practitioner" under Circular 230.  He reasons as follows:

11       •   OPR's regulatory authority extends only to practitioners—that is, individuals who
            are authorized (under §10.3 of Circular 230) to practice before the IRS.

12       •   He is suspended from, and thus not authorized to, practice.

13       •   Therefore, OPR has no authority to investigate whether he violated his suspension
            by engaging in practice.

14

15   This reasoning is fallacious.  OPR has inherent jurisdiction over unauthorized practice by either

16   (i) those who lack the requisite credentials to practice (because they are unlicensed as an attorney

17   or CPA or unenrolled by the IRS as an enrolled agent, enrolled actuary, or enrolled retirement

18   plan agent), or (ii) those who are suspended from practice for violating the regulations governing

19   practice.

20          OPR's authority to regulate tax practitioners comes from 31 U.S.C. § 330, "Practice

21   before the [Treasury] Department":

22
                                           12

(a) Subject to section 500 of title 5 [not relevant here], the Secretary of the Treasury may—

  (1) regulate the practice of representatives of persons before the Department of the Treasury; and

  (2) before admitting a representative to practice, require that the representative demonstrate—

   (A) good character;

   (B) good reputation;

   (C) necessary qualifications to enable the representative to provide to persons valuable service; and

   (D) competency to advise and assist persons in presenting their cases.

(b) After notice and opportunity for a proceeding, the Secretary may suspend or disbar from practice before the Department, or censure, a representative who—

 (1) is incompetent;

 (2) is disreputable;

 (3) violates regulations prescribed under this section; or

 4) with intent to defraud, willfully and knowingly misleads or threatens the person being represented or a prospective person to be represented.

 The Secretary may impose a monetary penalty on any representative described in the preceding sentence. If the representative was acting on behalf of an employer or any firm or other entity in connection with the conduct giving rise to such penalty, the Secretary may impose a monetary penalty on such employer, firm, or entity if it knew, or reasonably should have known, of such conduct. Such penalty shall not exceed the gross income derived (or to be derived) from the conduct giving rise to the penalty and may be in addition to, or in lieu of, any suspension, disbarment, or censure of the representative.

 (c) After notice and opportunity for a hearing to any appraiser, the Secretary may—

13

(1) provide that appraisals by such appraiser shall not have any probative effect in any administrative proceeding before the Department of the Treasury or the Internal Revenue Service, and

(2) bar such appraiser from presenting evidence or testimony in any such proceeding.

(d) Nothing in this section or in any other provision of law shall be construed to limit the authority of the Secretary of the Treasury to impose standards applicable to the rendering of written advice with respect to any entity, transaction plan or arrangement, or other plan or arrangement, which is of a type which the Secretary determines as having a potential for tax avoidance or evasion.

It is true that neither this statute, nor the regulations promulgated thereunder in 31 C.F.R. Part 10 (Circular 230), expressly provide that OPR's regulatory authority extends to persons who are suspended from practice before the IRS.  But that authority is clear nonetheless.

The Secretary has broad jurisdiction under 31 U.S.C. § 330, including the statutory authority to "prescribe regulations to carry out the duties and powers of the Secretary." 31 U.S.C. § 321(b)(1); 5 U.S.C. § 301.  The Secretary, in addition to the specific statutory authority granted by Congress, also has the inherent authority to regulate the practice of those before the Department and its constituent agencies.

When Congress expressly authorized the Secretary of the Treasury to "regulate the practice of representatives of persons before the Department of the Treasury," 31 U.S.C. § 330(a)(1), which authority has been delegated to OPR, this jurisdiction brought with it the inherent power to investigate and sanction those who engage in practice without authority to do so or who engage in practice contrary to the rules of practice.  As indicated, among the enumerated powers Congress granted to the Secretary in section 330 was the power to "suspend"

14

1    an individual from practice.  31 U.S.C. § 330(b).  Nothing indicates Congress intended for the

2    Secretary's (and by delegation, OPR's) jurisdiction to end as soon as a suspension is imposed.

3          Rather, the reasonable presumption is that Congress intended for oversight to continue

4    after suspension given that the statute also includes the more severe sanction of disbarment, as

5    well as the alternative sanction of a monetary penalty,[7] either or both of which are potentially

6    available in the case of practitioners who essentially disregard a censure or suspension.  See

7    *Black's Law Dictionary* 561, 1676 (10th ed. 2014) (defining "suspension" with respect to

8    lawyers as "The temporary deprivation of a person's powers or privileges, esp. of office or

9    profession; esp., a fairly stringent level of lawyer discipline that prohibits the lawyer from

10   practicing law for a specified period, usu. from several months to several years," while defining

11   disbarment as "The expulsion of a lawyer from the bar or from the practice of law, usu. because

12   of some disciplinary violation; the official act by which an attorney is deprived of the privilege

13   of practicing law."); *In re Morrissey*, 305 F.3d 211, 216 (4th Cir. 2002) ("Disbarment is the

14

15        [7] The provision allowing for imposition of a monetary penalty was added to section 330
     as part of the same legislation that added subsection (d) regarding written tax advice.  Pub. L.
16   No. 108-357, title VIII, § 822(a)(1), 118 Stat. 1418, 1586-87 (2004).  The monetary penalty was
     enacted as another tool to address the written advice described in subsection (d), likely because
17   the sanctions of suspension and disbarment were perceived as having little deterrent effect on
     opinion writers who did not make a formal presentation to the IRS.  As explained at the time:

18
          The Committee believes that it is critical that the Secretary have the authority to
19        censure tax advisors as well as to impose monetary sanctions against tax advisors
          because of the important role of tax advisors in our tax system.  Use of these
20        sanctions is expected to curb the participation of tax advisors in both tax shelter
          activity and any other activity that is contrary to Circular 230 standards.

21
     H.R. Rep. 108-548, at 276 (2004); see also S. Rep. 108-192, at 110 (2003).
22

severance of the status and privileges of an attorney, whereas suspension is the temporary forced

withdrawal from the exercise of office, powers, prerogatives, and privileges of a member of the

bar.") (quoting *State ex rel. Nebraska State Bar Ass'n v. Butterfield*, 111 N.W.2d 543, 546 (Neb.

1961)); 31 U.S.C. § 330(b) (a monetary penalty "may be in addition to, or in lieu of, any

suspension . . . .").[8]

     OPR has interpreted its jurisdiction accordingly.  For example, section 10.79(b) of

Circular 230 prohibits a suspended practitioner from engaging in practice before the IRS during

the period of suspension.[9]  Additionally, a type of disreputable conduct in §10.51(a) of Circular

230 for which an individual can be disciplined under §10.50 (including disbarment) is "Willfully

representing a taxpayer before an officer or employee of the Internal Revenue Service unless the

---

[8] Likewise, I.R.C. § 7408(a) and (c)(2) authorizes the United States to commence a civil action in United States district court to enjoin "any person" for "violation of any requirement under regulations issued under section 330 of title 31, United States Code."  In such an injunctive proceeding, the burden is on the United States to demonstrate the need for a permanent injunction.  *Donovan v. Brown Equipment and Service Tools, Inc.*, 666 F.2d 148, 157 (5th Cir. 1982) ("When an injunction is explicitly authorized by statute, proper discretion usually requires its issuance if the prerequisites for the remedy have been demonstrated and the injunction would fulfill the legislative purpose.").  In order to institute such a proceeding, the IRS must develop and refer a case to the Department of Justice to file a complaint commencing suit.  The Secretary and the Commissioner of Internal Revenue have delegated authority to OPR to administer and enforce the regulations in Circular 230, and exclusive responsibility for discipline, including disciplinary proceedings and sanctions.  31 C.F.R. §10.1(a)(1); IRS Delegation Order 25-16 (Rev. 1) (Sep. 3, 2014), Internal Revenue Manual 1.2.52.17 (09-03-2014).  OPR cannot develop a case for possible injunctive action unless OPR is able to investigate the surrounding facts and circumstances of the case, including using if necessary the office's authority under §10.20(a) to request information that is or may be relevant to the investigation.

[9] An agency's interpretation of its own regulations has "controlling weight unless it is plainly erroneous or inconsistent with the regulation."  *United States v. Larionoff*, 431 U.S. 864, 872 (1977); accord *Public Lands for the People, Inc. v. United States Dep't of Agriculture*, 697 F.3d 1192, 1199 (9th Cir. 2012).  Similarly, an agency's interpretation of its own jurisdiction is entitled to strong deference.  *City of Arlington v. FCC*, 133 S.Ct. 1863, 1868-73 (2013).

1  practitioner is authorized to do so pursuant to this part."  31 C.F.R. §10.51(a)(18).  Thus OPR's

2  jurisdiction includes investigating and if necessary disciplining Sexton (and possibly penalizing

3  Esquire as his employer) for engaging in unauthorized practice.[10]

4         The Supreme Court has long recognized an agency's inherent authority to regulate those

5  who practice before it.  In *Goldsmith v. U.S. Board of Tax Appeals*, 270 U.S. 117 (1926), the

6  Court determined that "so necessary is the power and so usual is it" for an agency to regulate

7  practitioners that a general grant of authority to the Board of Tax Appeals necessarily included

8  the authority to determine who was qualified to practice before it.  *Id.* at 122.  Agencies' inherent

9  authority to regulate the practitioners before them continues today.  E.g., *Davy v. S.E.C.*, 792

10  F.2d 1418, 1421 (9th Cir. 1986) (Securities and Exchange Commission had authority to disbar

11  accountant from practice before it under general statutory delegation to the S.E.C. to "make such

12  rules and regulations as may be necessary or appropriate to implement the provisions of this

13  chapter[.]"); *Herman v. Dulles*, 205 F.2d 715, 716 (D.C. Cir. 1953) (International Claims

14  Commission had inherent authority to regulate practice of those before it because an

15  ────────────

16       [10]Aside from whether Sexton's offer to provide written tax advice indicates that he may be engaging in unauthorized "practice before the IRS" as discussed in section 2 below, OPR would be entitled to investigate the nature of any written advice to this client or to other taxpayers and the circumstances under which the advice was given to determine whether Sexton is "incompetent" or "disreputable" within the meaning of 31 U.S.C. § 330(b)(1) and (2).  In addition, Sexton's conduct would be relevant to any future request to lift his suspension: "OPR considers an individual's practice, or attempt to practice, while suspended or disbarred as an aggravating factor to be weighed in deciding the individual's reinstatement at a future time."  "Guidance on Restrictions During Suspension or Disbarment from Practice Before the Internal Revenue Service," Hankla Declaration, Exhibit G; see also §10.81(a), Cir. 230 (precluding a reinstatement to practice "unless the Internal Revenue Service is satisfied that the petitioner is not likely to engage thereafter in conduct contrary to the regulations in this part, and that granting such reinstatement would not be contrary to the public interest").

17

"administrative agency that has general authority to prescribe its rules of procedure may set standards for determining who may practice before it").

By analogy, since courts of law are authorized to regulate the practice of members of the bar, they also enjoy the "implied corollary power to sanction those who invade the province of the profession."  *Kentucky Bar Ass'n v. Brooks*, 325 S.W.3d 283, 285 (Sup. Ct. Ky. 2010) (upholding state Supreme Court's authority to discipline a non-lawyer for engaging in unauthorized practice; reviewing case law).  See also *United States v. Johnson*, 327 F.3d 554 (7th Cir. 2003) (inherent power of courts to regulate attorneys extends to non-attorneys who are engaged in the unauthorized practice of law); *West Virginia State Bar v. Earley*, 109 S.E.2d 420, 440 (Sup. Ct. W.Va. 1959) ("It would indeed be an anomaly if the power of the courts to protect the public from the improper or unlawful practice of law were limited to licensed attorneys and did not extend to or apply to incompetent and unqualified laymen and lay agencies.").

Further, it is well established that a professional licensing or disciplinary body retains authority over a suspended member to investigate and act on alleged violations of the suspension or violations of law or rules of professional conduct while suspended.  As the Fourth Circuit Court of Appeals summarized the situation:

> While none of the federal courts of appeals seem to have considered this matter, and the opinion of no district court on the subject has come to our attention, we note that all of the States which have considered the question have come to the same conclusion, which is that an attorney may be disbarred for conduct which occurred during the time his license to practice law was suspended.

*In re Morrissey*, 305 F.3d 211, 216 (4th Cir. 2002) (citations omitted).  The *Morrissey* court took the same approach; in response to the argument that Morrissey "could not be charged with

18

1    violating rules of conduct for members of the bar, his license having been suspended," the court

2    held that the "question of whether Morrissey may be disbarred for conduct, all or part of which

3    occurred while his license to practice law had been suspended, is . . . without merit." *Id.*

4         Although Sexton is a disbarred lawyer, for Circular 230 purposes he is a suspended

5    practitioner.  On occasion, suspended attorneys have attempted to avoid responsibility for their

6    actions while suspended by arguing that they could not as a legal matter have practiced law

7    because they are no longer attorneys in good standing to practice and are not subject to rules of

8    practice that are applicable to attorneys.  Sexton's argument is virtually identical, namely, that

9    his actions cannot be practice regulated by statute or Circular 230 because he is not, since 2008,

10   a "practitioner" and even if he violates his suspension by practicing contrary to the terms of the

11   suspension, the violation is not actionable because Circular 230 pertains only to "practitioners."

12   Courts have had no trouble seeing through the hypocrisy of efforts to use a disciplinary

13   suspension as immunity for further professional misconduct.  In *Kirven v. Secretary of the Board*

14   *of Commissioners on Grievances and Discipline*, for example, the court characterized Kirven's

15   argument as "based on his assumption that an attorney who has been indefinitely suspended is

16   not an attorney and thus is not subject to this Court's disciplinary authority," but the court held

17   that "[t]his assumption is false."  246 S.E.2d 857, 858 (S.C. 1978).  See also *In re C de Baca*, 11

18   P.3d 426, 429-30 (Colo. 2000); *In re Chavez*, 1 P.3d 417, 422, 425 (N.M. 2000); *The Florida*

19   *Bar v. Ross*, 732 So.2d 1037, 1041-42 (Fla. 1998); *Matter of Wilkinson*, 834 P.2d 1356, 1362

20   (Kan. 1992); *In re Oliver*, 89 P.2d 229, 233-34 (Utah 1939).

21

22

1        If OPR has no authority to investigate and sanction unauthorized practice or other

2  violation of section 330 and its regulations, then OPR effectively loses its authority to regulate

3  the conduct of those who are authorized to practice.  That result would be absurd.

4        **2.  OPR's regulatory authority under 31 U.S.C. § 330 extends to tax professionals who offer written tax advice within the meaning of subsection (d), regardless of whether they represent clients in a typical tax controversy before the IRS.**

5

6      OPR has jurisdiction over Sexton because he offered written tax advice potentially within the

7  scope of 31 U.S.C. § 330(d), regardless of whether he is a representative authorized to practice

8  before the IRS (which he is currently not, because of his ongoing suspension from practice).

9  This case is materially distinguishable from *Loving v. Internal Revenue Service*, 742 F.3d 1013

10  (D.C. Cir. 2014),[11] a case that did not involve (or even mention) section 330(d).  The *Loving*

11  plaintiffs were in the business of preparing tax returns.  They were not traditional Circular 230

12  practitioners, and they were not in the business of authoring written tax opinions for corporate

13  clients or high net-worth individuals.  They filed suit to challenge a licensing regime that

14  Treasury and the IRS established in 2011 through final regulations incorporated into Circular

15  230.  The final regulations concerned the requirements that all tax return preparers who receive

16  compensation for merely preparing, or assisting in preparing, all or substantially all of a tax

17  return pass a minimum competency test, complete 15 hours of continuing education on an annual

18  basis, and comply with the duties and restrictions in Circular 230.  The court held that the

19  regulations exceeded the agencies' authority under the statute, specifically, the authority in

20

21        [11] The plaintiffs represent that the United States agrees that merits of this case are governed by *Loving*.  See Motion, page 3.  That representation is false.

22

subsection (a) to "regulate the practice of representatives of persons before the Department of the Treasury."  The circuit court held that to practice before the Treasury generally implied "practice during an investigation, adversarial hearing or other adjudicative proceeding," 742 F.3d at 1017. Since in the court's view tax return preparers in their preparation of returns are not "representatives" engaged in "practice," it held that the IRS lacked regulatory authority over them.   See also *Ridgely v. Lew*, 55 F.Supp.3d 89 (D.D.C. 2014) (OPR has no authority to regulate the fees charged by tax professionals to prepare and file "ordinary refund claims" (i.e., amended Forms 1120, U.S. Corporation Income Tax Returns) before the commencement of any adversarial proceedings with the IRS or formal representation before the IRS).

OPR asserted jurisdiction over Sexton because of a credible allegation of activity other than tax return preparation and not because he merely prepares returns or refund claims.  Indeed, the scope of his suspension from practice allowed him to prepare returns.  OPR's pre-allegation letter, attached to the Complaint as Exhibit B, shows that the purpose for OPR's investigation was to determine whether Sexton, during his suspension, had been practicing, beyond any mere tax return preparation, before the IRS within the meaning of section 10.2(a)(4) of Circular 230 and Notice 2011-6 (2011-3 I.R.B. 315).  The definition of "practice before the Internal Revenue Service" in §10.2(a)(4) in pertinent part provides that it includes "rendering written advice with respect to any entity, transaction, plan or arrangement, or other plan or arrangement having a potential for tax avoidance or evasion."  Treasury and the IRS added the clause to the definition in the wake of the enactment of subsection (d) to section 330 in October 2004.  72 Fed. Reg. 54540, 54545 (Sep. 26, 2007),  Specifically, a suspended practitioner such as Sexton may not,

1   because of the suspension, provide "written advice with respect to any entity, transaction plan or

2   arrangement, or other plan or arrangement, which is of a type which the Secretary determines as

3   having a potential for tax avoidance or evasion."  31 U.S.C. § 330(d).  Sexton is being

4   investigated because OPR reasonably believes that he may be providing such written advice[12] in

5   violation of his suspension.[13]

6          To repeat, OPR did not open an investigation because Sexton may have been preparing

7   tax returns for compensation or because he has a preparer tax identification number (PTIN).  It is

8   not disputed that he has been authorized to prepare returns under the terms of his 2008

9   suspension.  Rather, OPR's investigation is based on a complaint from a member of the public—

10  a former client—indicating that Sexton offered to provide written tax advice for compensation

11  while under an indefinite suspension from practice before the IRS.  *See* Complaint, Exhibit B;

12

13  [12] Esquire's website offers "asset protection" services and information about Nevis trust
    arrangements.  Hankla Declaration, Exhibit D (copy of printout).  The IRS website's "Examples
14  of Abusive Tax Schemes" includes an example of an income tax evasion scheme employing
    Nevis trusts and bank accounts.  *Id.* at Exhibit E, p. 2 ("Wyoming Businessman Sentenced for
15  Concealing Income in Caribbean Bank Account").  Nevis is a "tax haven" that does not have a
    tax treaty with the United States and does not honor information requests or legal process from
16  the United States or other foreign countries.  See Organization for Economic Co-Operation And
    Development (OECD), *2000 Progress Report: Towards Global Tax Co-operation: Progress in
17  Identifying and Eliminating Harmful Tax Practices*, p.17,
    http://www.oecd.org/ctp/harmful/2090192.pdf (listing Nevis as a "tax haven").

18  [13] Sexton represents on page 4 of his memorandum, at footnote 1, that subsection 330(d)
    is not at issue in this case: "Defendants do not assert, nor do they allege they are investigating,
19  Plaintiff Sexton as having 'rendering written advice with respect to any entity, transaction, plan
    or arrangement . . . having a potential for tax avoidance of evasion[.]'"  That is not accurate.  The
20  government has made it clear that OPR's investigation was based on an unsolicited complaint by
    a member of the public who provided information indicating that Sexton offered to provide
21  written advice within the meaning of subsection 330(d).  See U.S.' Amended Memorandum,
    ECF No. 25, pp. 15, 20; U.S.' Reply, ECF No. 33, p. 12.

22                                            22

Hawkins Declaration, ¶ 3.  *Loving* does not hold or imply that OPR is powerless to regulate those who offer written tax advice within the meaning of 31 U.S.C. § 330(d).  Cf. 31 U.S.C. § 330(b)(4) (authorizing OPR to sanction a CPA who "misleads or threatens the person being represented *or a prospective person to be represented*," thus extending OPR's authority to conduct occurring before an actual practitioner-client relationship is established).

The grant of jurisdiction under subsection 330(d) is extremely broad and covers those who engage in the conduct described therein—regardless of whether they are "representatives" who "practice before" the IRS as described under subsection (a).[14]  This is clear from the introductory language of subsection (a) (in italics): "*Nothing in this section or in any other provision of law shall be construed to limit the authority of the Secretary of the Treasury* to impose standards applicable to the rendering of written advice with respect to any entity, transaction plan or arrangement, or other plan or arrangement, which is of a type which the Secretary determines as having a potential for tax avoidance or evasion."

What subsection 330(d) means for this case is that, notwithstanding the title of the section or the language in subsection 330(a) about "the practice of representatives of persons before the Department of the Treasury," the Secretary (through OPR) has explicit authority "to impose standards applicable to the rendering of written advice with respect to any entity, transaction plan or arrangement, or other plan or arrangement, which is of a type which the Secretary determines

---

[14] Note that Sexton told Kern that he could petition the IRS on her behalf to seek retroactive approval for her GmbH as a foreign company.  See Kern Decl., ¶ 8.  Presumably this would have involved representing her before the IRS, either in his own right or as "ghost" representative without making a formal appearance on her behalf.

1   as having a potential for tax avoidance or evasion."  Stated differently, OPR has the authority to

2   regulate tax professionals who provide "written advice" within the meaning of subsection (d)

3   regardless of whether they "practice before the" IRS within the meaning of subsection (a) as

4   narrowly construed by the *Loving* court.[15]

5          OPR's jurisdiction under section 330(d) is well-established.  Promoting tax shelters

6   through written legal advice, for example, is activity squarely within the scope of that

7   jurisdiction.  Subsection (d), added to section 330 in 2004 to confirm existing authority, clearly

8   shows Congress' intent that OPR may regulate those who render written tax advice to a client,

9   even if the advice is never actually presented to the IRS on behalf of the client.[16]  Pub. L. No.

10

11    [15] Similarly, subsection 330(c) grants the Secretary regulatory jurisdiction over
      appraisers.  Appraisers do not practice tax law in the form of representing clients before the IRS.
12    Appraisers nevertheless can be sanctioned with a reprimand or disqualification as an appraiser
      for federal tax purposes for violating the regulations in Circular 230.  31 C.F.R. §§ 10.50(b),
13    10.60(b).  Similar to tax opinion writers, appraisers commonly prepare written valuation reports
      (appraisals) for taxpayers that appraise the value of an item of real or personal property for the
14    client's use in later taking a position or reporting an item on a tax return, such as the value of a
      charitable contribution claimed as a deduction.  Certain contributions, based on threshold
15    criteria, require "qualified appraisals" under applicable rules.  I.R.C. § 170(f)(11) (also enacted
      as part of the American Jobs Creation Act, Pub. L. No. 108-357, Title VIII, § 883(a), 118 Stat.
16    1418, 1631-32 (2004)); 26 C.F.R. § 1.170A-13(c) (adopted in 1988, 53 Fed. Reg. 16076, 16080-
      85 (May 5, 1988)); Notice 2006-96 (2006-2 C.B. 902).  Thus, as Congress well knew, appraisers
17    interface with the tax system other than as a taxpayer's designated representative in a tax
      controversy with the IRS.

18    [16] Circular 230 has long governed the provision of both pre-transactional and post-
      transactional tax advice occurring outside of hearings, conferences, meetings, or other
19    proceedings before the IRS.  For example, in 1984, Circular 230 was amended to provide
      practitioner standards for opinions issued in tax shelter offerings.  49 Fed. Reg. 6719 (Feb. 23,
20    1984).  Even long before Circular 230 regulated tax shelter opinions, it included provisions
      prohibiting bad advice.  The 1934 version of Circular 230 provided in section 9 the "Causes for
21    reprimand, suspension, or disbarment," including (as no. 24), "Suggesting to a client or a
      prospective client a plan known to be illegal for evading payment of Federal taxes,"

22

1   108-357, Title VIII, § 822(b), 118 Stat. 1418, 1586-87 (2004) (the "American Jobs Creation

2   Act").  The Conference Report explains that the amendment "confirms the present-law authority

3   of the Secretary to impose standards applicable to written advice with respect to an entity, plan,

4   or arrangement that is of a type that the Secretary determines as having a potential for tax

5   avoidance or evasion."  H.R. Conf. Rep. No. 108-548, pt. 1 at 277 (2004).  This strongly

6   indicates that Congress intended OPR's authority over tax professions to extend beyond the

7   representation of taxpayers in an active proceeding before the IRS, at least as to written tax

8   advice having a potential for tax avoidance or evasion.[17]

9          In the area of written advice on tax positions and transactions, the controversy or the

10  preparation in anticipation of the controversy has effectively already begun even prior to the

11  execution of the transaction.  Congress understood the nature and purpose of most written tax

12  advisory opinions when it enacted section 330(d).  In other words, Congress knew that the advice

13  is generated before or contemporaneous with the transaction or tax treatment that the advice

14  discusses.  And a taxpayer naturally wants or needs the advice before committing to the course

15  of action that is the subject of the advice.  The advice precedes and controls the preparation of a

16  tax return (or multiple years' returns) claiming the benefits of the transaction (losses, deductions,

17  credits, etc.).  The advice is typically intended to assure taxpayers of the sustainability or at least

18

19         [17]  Sexton advised Kern that she could avoid some of the employment taxes on her
       compensation from her business, GloBIS, by converting the company to a subchapter S
20     corporation and begin taking annual profit distributions along with a reduced salary.  Kern
       Declaration, ¶ 9.  This type of arrangement could be improper.  See, e.g., *Spicer Accounting, Inc.*
21     *v. United States*, 918 F.2d 90 (9th Cir. 1990) (payments to president and sole stockholder of S
       corporation were wages, not dividends, so employment taxes should have been withheld).

22                                                        25

explain the weight of authority supporting (or contrary to) the transaction, the likelihood of success on the merits, and the potential consequences in terms of additional tax and penalties in the event of an adverse outcome.  The advice often accounts for the concerns of the participants to the transaction about preserving their ability in the future to assert a reasonable-cause defense under 26 U.S.C. § 6664 and its regulations against the imposition of a penalty (given the substantial risk that the transaction will be disallowed by the IRS)—*i.e.*, to claim reasonable cause based on the taxpayer's reliance on a written opinion of a tax professional.  The written advice that Congress intended to be subject to "standards" established in regulations under 31 U.S.C. § 330(d) would not be limited to advice issued during the representation of taxpayers as part of "presenting their cases" (31 U.S.C. § 330(a)(1)(D); *Loving*, at 1018-20) before IRS examiners, collectors, or Appeals officers.

Pursuant to this Congressional mandate under section 330(d), in 2006 an Administrative Law Judge disbarred a tax practitioner based on a proceeding commenced by OPR.  *Director, Office of Professional Responsibility v. Settles*, Complaint No. 2004-11 (Decision of Mar. 2, 2006) (copy attached to Hankla Declaration as Exhibit F).  The conduct complained of did not involve representing persons in cases before the IRS within the meaning of *Loving*.  It involved the promotion of an abusive tax shelter to clients (and for the practitioner's preparing his own returns based on the same shelter).  The shelter strategy was contained in a binder of documents that the practitioner sold for $10,000.  The practitioner gave advice to clients or to their return preparers, but he himself did not make any appearance on their behalf in any case before the IRS.  He, like Sexton, had an internet website for his business.

1          Similarly, in 2009, an ALJ held that, under the 1996 version of Circular 230, a tax

2    attorney had engaged in practice before the IRS when he issued a written legal opinion to a client

3    in connection with a proposed tax-motivated lease transaction.  *Director, Office of Professional*

4    *Responsibility v. Sykes*, OPR Complaint No. 2006-1 (Decision of Jan. 29, 2009),

5    www.irs.gov/pub/irs-utl/sykes_alj_dec_redacted.pdf.  See Hankla Declaration, Exhibit H.

6    Sykes, the respondent, argued, among other things, that OPR had no jurisdiction over him.  The

7    ALJ disagreed (italics added):

8              Section 10.2(d) of 31 C.F.R. [1996 version of Circular 230] broadly
       defines practice before the IRS to include all matters connected to a presentation
9        to the IRS or any of its officers and employees relating to a taxpayer's rights,
       privileges, or liabilities under the federal tax laws.  The ultimate purpose of the
10       basis opinions prepared by Respondent which are the subject matter of this
       proceeding was to convince the IRS [if the IRS challenged the transaction] that
11       the basis of the stock in question for tax purposes was what the opinions said it
       was and to shield the taxpayer from penalties that might be asserted if the IRS
12       disagreed with the basis being claimed.  *I find that the opinions were intended and*
       *were reasonably expected to be a part of the taxpayer's presentation to the IRS in*
13       *support of its position with respect to the basis of the stock and that Respondent's*
       *preparation of those opinions constituted practice before the IRS.*  Consequently,
14       I find that Respondent is subject to the law and regulations governing such
       practice.

15   *Id.* at page 5.

16         To sum up, taking the allegations of the complaint as true, supplemented by the materials

17   and information in the Hawkins Declaration, Kern Declaration, and Hankla Declaration, when

18   OPR sent its letter and document request to Sexton, it properly exercised its authority under 31

19   U.S.C. § 330(d) and Circular 230.  OPR's regulatory jurisdiction over Sexton should be clear.

20   OPR has determined in the exercise of its discretion that under the facts and circumstances as

21   currently known, an investigation is warranted.  OPR should be entitled as a matter of law to

22                                            27

proceed with that investigation.  The Court should deny the plaintiffs' motion for judgment on the pleadings and grant the United States' cross-motion for summary judgment.  This action should be dismissed.  If the Court does not dismiss this action as a result of its ruling on the motions, it should order the parties to file a joint discovery plan; if this action proceeds forward, the United States should be allowed to conduct discovery as to the nature and extent of the plaintiffs' tax services so that the Court can determine whether OPR's regulatory jurisdiction permits OPR to conduct its investigation.

///

///

///

1

## Conclusion

2          Based on the foregoing, the Court should deny the plaintiffs' motion for judgment on the

3   pleadings because OPR has regulatory jurisdiction over Sexton as a suspended practitioner who

4   may have engaged in unauthorized practice before the IRS.  Further, the Court should grant the

5   United States' cross-motion for summary judgment and dismiss this action so that OPR's

6   administrative investigation of Sexton, which was interrupted by the filing of the complaint

7   herein, may resume and proceed to its conclusion.  In the alternative, if the Court does not

8   dismiss this action, it should order the parties to file a joint discovery plan.

9          DATED this 23d day of December, 2015.

10                                             CAROLINE D. CIRAOLO
                                               Acting Assistant Attorney General
11

12                                             */s/ W. Carl Hankla*
                                               W. CARL HANKLA
13                                             Trial Attorney, Tax Division
                                               U.S. Department of Justice
14                                             P.O. Box 683
                                               Washington, DC 20044
15                                             Telephone: (202) 307-6448
                                               Fax: (202) 307-0054
16                                             w.carl.hankla@usdoj.gov
                                               *Attorneys for the United States of America*
17
                                               DANIEL G. BOGDEN
18                                             United States Attorney
                                               District of Nevada
19                                             *Of Counsel*

20

21

22

1

## **CERTIFICATE OF SERVICE**

2

I HEREBY CERTIFY that service on the following was made by the Court's CM/ECT

3    system on this date:

4              DESA BALLARD
              desab@desaballard.com
              STEPHANIE WEISSENSTEIN
5              Stephanie@desaballard.com
              *Attorneys for James C. Sexton Jr.*

6              PUOY K. PREMSRIRUT
              puoy@brownlawlv.com
7              *Attorney for Esquire Group LLC*

8              SHAWN R. PEREZ
              Shawn711@msn.com
9              *Attorney for James C. Sexton Jr.*

10                              /s/ W. Carl Hankla
                              W. CARL HANKLA
11                              Trial Attorney, Tax Division
                              U.S. Department of Justice
12

13

14

15

16

17

18

19

20

21

22

30